Robin L. Cohen (rcohen@cohenziffer.com)
Alexander M. Sugzda (asugzda@cohenziffer.com)
COHEN ZIFFER FRENCHMAN & MCKENNA LLP
1325 Avenue of the Americas
New York, New York 10019

*Attorneys for Plaintiff Cricket Valley Energy Center, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CRICKET VALLEY ENERGY CENTER, LLC,<br><br>Plaintiff,<br><br>v.<br><br>FACTORY MUTUAL INSURANCE COMPANY,<br><br>Defendant. | Civil Action No.:<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Cricket Valley Energy Center, LLC ("CVEC"), by and through its undersigned counsel, as and for its Complaint against Defendant Factory Mutual Insurance Company ("FM"), alleges as follows:

## PRELIMINARY STATEMENT

1. This diversity action for breach of contract, declaratory relief, and breach of the implied covenant of good faith and fair dealing arises out of FM's refusal to cover significant losses falling squarely within the coverage of a property damage and business interruption insurance policy FM sold to CVEC for the policy period April 17, 2024 to April 17, 2025 (the "Policy," attached hereto as Exhibit 1). In fact, FM has unreasonably denied coverage on grounds that it *knows* have been rejected by New York's courts, in a case to which FM was a party. Therefore, CVEC has been forced to bring this action to obtain the insurance coverage it paid for

and to which it is entitled, as well as consequential damages resulting from FM's breach of the Policy's implied covenant of good faith and fair dealing.

2. By way of background, CVEC operates the Cricket Valley Energy Center (the "Power Plant") in Dover Plains, New York. CVEC earns revenue in two main ways. First, it earns revenue by selling the energy it generates ("Energy Revenue") to the New York State Independent System Operator ("NYISO") energy marketplace. Second, it earns revenue through capacity payments that it receives from NYISO, which administers the electricity market within which the Power Plant operates. Capacity revenue is based upon the Power Plant maintaining its "capacity" to operate when called upon to do so by NYISO ("Capacity Revenue"). CVEC's Capacity Revenue is based on a formula that yields higher payments the more reliably the Power Plant operates. Further, because Capacity Revenue is pegged to reliability of energy production over time, the Capacity Revenue for a particular month depends upon the energy output measured a number of months prior.

3. Because of this system, CVEC's ability to produce energy consistently and predictably over time is a critical driver of its overall business economics. As a result, CVEC paid substantial premiums to FM to insure against both physical damage to the Power Plant, *and* any losses of Energy Revenue and Capacity Revenue that it may incur as a result of such damage. These premiums were based on submitted Property Damage and Business Interruption income values, including for capacity payment values, that FM accepted and on which it charged premiums.

4. On July 15, 2024, CVEC experienced an event indisputably covered under the Policy. Specifically, faulty seals on a generating step-up ("GSU") transformer at the Power Plant, known as GSU-3, caused damage to the transformer and an outage. As a result of this incident, the

GSU-3 transformer needed to be removed from the Power Plant and transported to Montgomery, Alabama, for repairs.

5. During the course of those repairs, in January 2025, an improper nitrogen application caused a fire that caused further damage to the GSU-3 transformer. CVEC's repair contractor expedited repairs of the fire damage and returned the GSU-3 transformer fully repaired in 2025, with only a minimal delay from the repair schedule in place prior to the fire.

6. As a result of this incident, CVEC suffered an immediate decrease in Energy Revenue. At the same time, it experienced an immediate decrease in its energy capacity performance, which automatically resulted in a future loss of Capacity Revenue. Specifically, due to the decreased capacity performance from July 2024 to August 2025, CVEC expects to realize losses of approximately $16 million in Capacity Revenue between May 2025 and October 2027.

7. Although FM has agreed to cover the cost of repairing the GSU-3 transformer, most of CVEC's lost Energy Revenue, and a small percentage of its lost Capacity Revenue, it has refused to pay the bulk of CVEC's lost Capacity Revenue. FM does not dispute that CVEC will suffer this loss of Capacity Revenue. Nor does it dispute that these losses resulted from covered physical damage to the GSU-3 transformer. Instead, according to FM, it is only obligated to cover lost Capacity Revenue that is actually realized during the Policy's "Period of Liability," which begins at the time of physical loss or damage and ends when the property could be repaired or replaced and made ready for operations under the same conditions existing before the damage.

8. FM's position is contrary to the plain language of the Policy and common sense. The Capacity Revenue losses are automatically "sustained" as soon as there is a negative impact upon the Power Plant's production capacity, even if those losses are not realized until months later under the applicable lagging NYISO payment formula for Capacity Revenue, which is necessarily

backward-looking. Indeed, a contrary interpretation would drastically restrict coverage for lost Capacity Revenue given that Capacity Revenue losses *always* accrue months after the incident that causes a disruption to the policyholder's ability to maintain reliable energy capacity availability.

9. FM also sold CVEC a policy for the subsequent policy period, such that it continuously insured CVEC for losses resulting from property damage and business interruption losses throughout the entirety of the relevant time period, yet its position is that there is no coverage for these losses.

10. FM's position is particularly problematic because FM previously tried, and failed, to assert this argument in a different case involving a different power plant, arguing that the power plant was not entitled to Capacity Revenue coverage because the losses did not technically accrue until after the Period of Liability. The New York Supreme Court squarely rejected that argument both at the trial and appellate court level. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. TransCanada Energy USA, Inc.*, 52 Misc. 3d 455 (Sup. Ct., N.Y. Cnty. 2016), *aff'd*, 153 A.D.3d 1153 (1st Dep't 2017). As the court recognized, "the loss at issue here is the decreased capacity sustained during the period of liability, even though the amount of the loss was not ascertained until after the period of liability when the auctions were held." *Id.* at 468.

11. FM has also put its thumb on the scale to reduce coverage owed to CVEC by claiming that even though all damage to the transformer arose out of the initial breakdown, CVEC's claim constitutes two separate "occurrences" under the Policy, and therefore is subject to two separate deductibles. And the deductible FM has applied to the second "occurrence," the fire at the repair facility that likely caused only minor additional delay, is nearly twice as high as the deductible applied to the first "occurrence."

12. Based on this clearly self-interested position not consistent with the language of the Policy, FM claims that the applicable deductible is approximately $6 million higher than the deductible as calculated by CVEC's accountants based on the Policy language.

13. CVEC thus asks this Court to (i) find FM liable for breaching the Policy by failing to provide full coverage for CVEC's claim; (ii) declare that CVEC is entitled to full coverage under the Policy for its loss, including its lost Capacity Revenue; and (iii) find FM liable for its breach of the implied covenant of good faith and fair dealing in the Policy and hold FM accountable for its unreasonable claims-handling practices.

## PARTIES

14. CVEC is a limited liability company formed under the laws of New York with its principal place of business in Dover Plains, New York. The sole member of CVEC is Cricket Valley Energy Holdings LLC. CVEC is wholly owned by Cricket Valley Energy Holdings LLC.

15. The sole member of Cricket Valley Energy Holdings LLC is Cricket Valley Energy Intermediate Holdings LLC. Cricket Valley Energy Holdings LLC is wholly owned by Cricket Valley Energy Intermediate Holdings LLC.

16. The members of Cricket Valley Energy Intermediate Holdings LLC are: Cricket Valley Energy Holdings II LLC; Kiwoom US Power LLC; PE-US Jiminy Aggregator L.P.; PE-US Jiminy OFLEX Blocker, LLC; MDCF II Investment Fund B SCS; and Cricket Valley Funding LLC.

17. The sole member of Cricket Valley Funding LLC is Olympus Power, LLC. The ultimate members and/or partners of Olympus Power, LLC, are citizens of New Jersey. No ultimate members and/or partners of Olympus Power, LLC, are citizens of Rhode Island.

18. The investment fund MDCF II Investment Fund B SCS, a Luxembourg limited partnership, is structured as a master fund with no limited partners other than its affiliated feeder funds, MDCF II, LP, and MDCF II Intermediate Fund, LLC, both of which are Delaware entities. There are no Rhode Island citizens among the members, general partner, corporate control group, or ultimate controlling persons of these entities.

19. PE-US Jiminy OFLEX Blocker, LLC, has a principal place of business in New York and is organized in the state of Delaware, and none of its constituent members and/or partners are citizens of Rhode Island.

20. PE-US Jiminy Aggregator L.P. has a principal place of business in New York and is organized in the state of Delaware, and none of its constituent members and/or partners are citizens of Rhode Island.

21. The ultimate members of Kiwoom US Power LLC are citizens of South Korea. No ultimate member and/or partner of Kiwoom US Power LLC is a citizen of Rhode Island.

22. The sole member of Cricket Valley Energy Holdings II LLC is Cricket Valley Energy Partners LLC. Cricket Valley Energy Holdings II LLC is wholly owned by Cricket Valley Energy Partners LLC.

23. Cricket Valley Energy Partners LLC is a Delaware limited liability company. No ultimate members of Cricket Valley Energy Partners LLC are citizens of Rhode Island.

24. Upon information and belief, FM is a corporation formed under the laws of Rhode Island with its principal place of business in Rhode Island.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties to this action and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

26. Venue in this Court is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### I. CVEC's Energy Production Business

27. CVEC operates the Power Plant in Dover Plains, New York.

28. CVEC earns revenue in two main ways: (1) Energy Revenue from the sale of the energy it generates, (2) Capacity Revenue through payments received from NYISO.

29. Capacity Revenue is calculated based on a formula utilized by NYISO to compensate energy producers for maintaining the capacity to generate reliable electricity when called upon to do so by the NYISO market. Under this formula, CVEC's Capacity Revenue is directly tied to its ability to reliably and consistently maintain that capacity. Further, this formula is backward-looking, such that an interruption or reduction in capacity in a given month has a direct and automatic impact on Capacity Revenue realized a number of months in the future.

### II. The Policy

30. Given the nature of its business and revenue streams, CVEC purchased insurance to cover losses it might experience if its Power Plant suffered physical damage, including the costs to repair that damage, *and* resulting losses of Energy Revenue and Capacity Revenue.

31. Specifically, FM sold CVEC a policy covering "ALL RISKS OF PHYSICAL LOSS OR DAMAGE" to the property covered for the period of April 17, 2024 to April 17, 2025. Ex. 1 at pp. 2, 8 of 74.[1]

32. The Policy identifies CVEC as the named insured and the Schedule of Locations identifies only a single location, the Power Plant. *Id.* at p. 8 of 74.

33. The Policy has a per-**occurrence**[2] limit of $1,517,187,397 and states that "[l]imits of liability in an **occurrence** apply to the total loss or damage at all **locations** and for all coverages involved, including any insured TIME ELEMENT loss." *Id.*, Declarations § 10 (p. 10 of 74).

34. The Policy defines **occurrence** as "the sum total of all loss or damage of the type insured, including any insured TIME ELEMENT loss, arising out of or caused by one discrete event of physical loss or damage." *Id.*, General Provisions § 15 (p. 68 of 74).

35. The Policy defines **location** "as specified in the Schedule of Locations." *Id.*, General Provisions § 15 (p. 67 of 74).

36. The Policy includes the following sublimits:

| | |
|---|---|
| CLAIMS PREPARATION COSTS | USD 50,000 plus 50% of the amount recoverable under this coverage in excess of USD 50,000 |
| EXPEDITING COSTS and EXTRA EXPENSE combined | USD 100,000,000 |
| TIME ELEMENT | USD 236,594,804, not to exceed the following:<br><br>1. USD 185,713,434 for POWER INCOME, not to exceed 120% of the amount shown for each month of the Power Income Monthly Forecast and Capacity Resource Deficiency Charge, Appendix A |

[1] The Policy does not have consecutive page numbering throughout. Page numbers referenced herein are to the page number in the PDF version of the document attached as Exhibit 1.

[2] Terms in bold appear in bold in the Policy.

| | |
|---|---|
| | 2. USD 50,881,370 for **capacity resource deficiency charge**, not to exceed the amount shown for each month of the Power Income Monthly Forecast and Capacity Resource Deficiency Charge, Appendix A |

*Id.*, Declarations § 10 (pp. 10–11 of 74).

37. The Policy defines **capacity resource deficiency charge** as "a charge equal to 0.5 times the applicable market-clearing price of unforced capacity as determined in the New York Independent System Operator's (NYISO) Installed Capacity Spot Market Auction multiplied by the number of MW the Insured location is deficient." *Id.*, General Provisions § 15 (p. 65 of 74).

38. The Policy contains the following per-**occurrence** deductibles:

| | |
|---|---|
| Location No. 001 as described on this Policy [the Power Plant] | Property Damage: USD 1,000,000<br><br>Time Element: 60 **day equivalent contribution** |
| generating step-up transformers | Property Damage: USD 1,500,000<br><br>Time Element: 60 **day equivalent contribution** |
| All Other Loss | USD 1,000,000 |

*Id.*, Declarations § 11 (p. 13 of 74).

39. The Policy defines **day equivalent contribution** as "an amount equivalent to the number of days stated times the following: the 100% daily Time Element value for the property experiencing the physical loss or damage . . . ." *Id.*, General Conditions § 15 (p. 66 of 74).

40. The Policy does not provide a number for the "100% daily Time Element value" for the Power Plant.

41. The Policy provides that "if two or more deductibles apply to an **occurrence**, the total to be deducted will not exceed the largest deductible applicable. For the purposes of this

provision, when a separate Property Damage and a separate Time Element deductible apply, the sum of the two deductibles will be considered a single deductible." *Id.*, Declarations § 11(E) (p. 14 of 74).

42. The Time Element section of the Policy provides:

> A. This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured:
>
> 1) to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;
>
> 2) used by the Insured, or for which the Insured has contracted use;
>
> 3) while located as described in the INSURANCE PROVIDED provision or within 1,000 feet/300 metres thereof, or as described in the TEMPORARY REMOVAL OF PROPERTY provision; . . .
>
> 5) during the Periods of Liability described in this section,
>
> provided such loss or damage is not at a **contingent time element location**.

*Id.*, Time Element § 1.A (p. 40 of 74).

43. The reference to the "TEMPORARY REMOVAL OF PROPERTY" provision is to an "Additional Coverage" in the Property Damage section, which provides:

> When insured property is removed from an insured **location** for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:
>
> 1) while at the premises to which such property has been moved; and
>
> 2) for physical loss or damage as provided at the insured **location** from which such property was removed.

*Id.*, Property Damage § 6.S (p. 36 of 74).

44. The Time Element coverage specifically covers "Power Income" as follows:

> Measurement of Loss:
>
> 1) The recoverable POWER INCOME loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:
>
> a) net sales value of production and Production Tax Credits;
>
> b) less the cost of fuel, raw stock, materials, supplies and any additional charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;
>
> c) plus all other earnings derived from the operation of the business.
>
> d) Capacity Payments, Availability Payments, or any other income provided by Power Purchase or similar contracts in force at the time of insured physical loss or damage, and penalties provided by such contracts for the inability to deliver contracted capacity including **capacity resource deficiency charge** obligations per Power Income Monthly Forecast and Capacity Resource Deficiency Charge, Appendix A.
>
> 2) In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had there been no interruption of production or suspension of business operations or services.
>
> 3) There is recovery hereunder to the extent that the Insured is:
>
> a) wholly or partially prevented from continuing business operations or services;
>
> b) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;
>
> c) unable to continue such operations or services during the PERIOD OF LIABILITY; and
>
> d) able to demonstrate a loss of sales for the operations, services or production prevented.

*Id.*, Time Element § 2.A (pp. 41–42 of 74).

45. Although the term "Actual Loss Sustained" is capitalized, it is not defined in the Policy.

46. The "Period of Liability" section provides:

> A. The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, . . . and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:
>
> 1) For building and equipment, the period:
>
> a) starting from the time of physical loss or damage of the type insured; and
>
> b) ending when with due diligence and dispatch the building and equipment could be:
>
> (i) repaired or replaced; and
>
> (ii) made ready for operations,
>
> under the same or equivalent physical and operating conditions that existed prior to the damage.
>
> c) not to be limited by the expiration of this Policy.

*Id.*, Time Element § 3.A.1 (p. 44 of 74).

47. The Period of Liability section further provides: "If two or more Periods of Liability apply such periods will not be cumulative." *Id.*, Time Element § 3 (p. 46 of 74).

48. The Policy includes Appendix A, titled "**Power Income Monthly Forecast and Capacity Resource Deficiency Charge**," which is a chart of months from April 2024 to September 2025 with amounts listed for **Power Income** and **Capacity Resource Deficiency Charge**. *Id.*, Appendix A (p. 72 of 74).

## III. CVEC Suffers Covered Property Damage and Time Element Losses

49. On July 15, 2024, faulty seals on a GSU-3 transformer at the Power Plant resulted in a breakdown of that transformer, a power outage, and a reduction in energy output.

50. The non-functioning GSU-3 transformer was transported to a facility in Montgomery, Alabama, for repairs by a contractor. In January 2025, during the repair process, a fire caused further damage to the transformer. However, the contractor was able to expedite the repair timeline, such that the fire only slightly delayed the repair schedule, and the transformer was fully repaired and reinstalled at the Power Plant by August 2025.

51. As a result, CVEC experienced numerous losses, including property damage, Energy Revenue losses, and approximately $16 million in Capacity Revenue losses that it has already realized and/or expects to realize.

**IV. FM's Wrongful Attempts to Limit Coverage**

52. CVEC, through its broker, gave timely notice of its claim to FM on or around July 17, 2024.

53. FM subsequently acknowledged CVEC's claim and began the process of adjusting the claim.

54. On August 13, 2024, FM claims handler Claude Hawley wrote to Jack Sloyan (acting on behalf of CVEC at the time), agreeing that the damage to the GSU-3 transformer was covered under the Policy.

55. FM's letter copied and pasted various potentially applicable Policy provisions and asserted that a $1.5 million Property Damage deductible and 60 **day equivalent contribution** Time Element deductible applied to the loss.

56. Thereafter, FM began making advance payments to CVEC, totaling $18,866,360 as of November 26, 2025, in connection with CVEC's Time Element losses.

57. On December 5, 2024, Mr. Hawley sent an email to Matthew Whalen (also acting on behalf of CVEC at the time), presenting FM's position on coverage for CVEC's lost Capacity Revenue. As relevant here, Mr. Hawley wrote:

> The POL [Period of Liability] for equipment begins when there is physical loss or damage of the type insured and ends when the equipment could be diligently repaired or replaced and made ready for operations under the same or equivalent conditions that existed before the damage occurred. . . .
>
> As illustrated in our example from the Marsh Schedules, if we assume GSU3 returns to service in June 2025, the lost capacity in May & June 2025 would be incurred during the POL and will be recoverable. Any additional lost capacity after June 2025 in this example would fall outside the POL and would not be recoverable per the policy terms and conditions.

58. Put simply, FM's position was that losses resulting from a reduction in capacity during the Period of Liability were not covered under the Policy if those losses materialized after the Period of Liability ended.

59. Following the December 5 email, FM continued to make advance payments of undisputed elements of the claim to CVEC.

60. In April 2025, Mr. Hawley wrote again to Mr. Sloyan and confirmed that the additional damage caused by the fire during repair was covered under the Policy. FM suggested in the letter that new Property Damage and Time Element deductibles would be applicable and provided a hypothetical calculation of application of the 60 **day equivalent contribution** deductible.

61. On November 26, 2025, FM stated it was making its final payment toward what it had calculated as the undisputedly covered portion of the claim, subject to two separate deductibles totaling $8,442,113, comprised of $2,895,673 for the damage sustained on July 15, 2024, which it characterizes as a first "**occurrence**," and $5,546,440 for the additional damage sustained in January 2025, during the course of repair, which it characterizes as a second "**occurrence**."

62. FM has thus refused to cover CVEC's remaining Capacity Revenue losses.

63. FM's position regarding the applicable deductible and its efforts to drastically limit the availability of coverage for Capacity Revenue losses are contrary to the plain terms of the Policy.

64. Regarding the deductible, CVEC's claim constitutes a single **occurrence** under the Policy and is subject to only one deductible, which CVEC has calculated to be $2,443,776. The GSU-3 transformer was only in the repair facility as a result of the initial breakdown, such that all loss or damage "arising out of" the initial breakdown, including the fire, constitutes a single occurrence. FM's effort to create a second **occurrence** is a transparent attempt to earn a windfall of more than $5 million it would otherwise have to pay toward CVEC's claim.

65. Regarding Capacity Revenue, although CVEC has calculated that it will lose approximately $16 million in Capacity Revenue as a result of the damage to the GSU-3 transformer, FM has only paid $2,047,536 representing lost Capacity Revenue for the months of May through August 2025, and has refused to pay at least $13.8 million of remaining Capacity Revenue. This lost Capacity Revenue is attributable to and was sustained during the Period of Liability, even if those losses were not realized until a later time as a result of the NYISO's backward-looking formula for calculating Capacity Revenue.

66. Notably, FM has taken this erroneous coverage position despite knowing that its interpretation of the Period of Liability has already been rejected. Specifically, FM made this exact argument in a prior litigation in which it sought to evade its coverage obligations, and the court resoundingly rejected it. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. TransCanada Energy USA, Inc.*, 52 Misc. 3d 455 (Sup. Ct., N.Y. Cnty. 2016), *aff'd*, 153 A.D.3d 1153 (1st Dep't 2017). In addition to rejecting this argument under the policy language, the court also explained that "acceptance of the insurers' interpretation of the policy would result in a windfall to them as they

would not be obliged to pay [the policyholder] any amount for its business interruption despite it being undisputed that [the policyholder's] business was interrupted for months, simply because [the policyholder] did not actually receive the decreased revenue until months after the repairs were made." *Id.* at 469. FM is seeking to gain that same windfall here by taking the same unreasonable position New York courts have already rejected, twice. Thus, as a result of FM's unreasonable handling of this claim, resolution of the claim has been needlessly delayed, CVEC has been deprived of the coverage it paid for, and CVEC has been forced to incur significant costs in connection with this dispute.

## FIRST CAUSE OF ACTION
**(Breach of Contract)**

67. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs, specifically paragraphs 1, 4–9, and 30–65, as if fully set forth herein.

68. The Policy constitutes a valid and enforceable contract between CVEC and FM.

69. CVEC has complied with all obligations under the Policy.

70. As described above, CVEC has sustained or will sustain losses of at least $14 million in Capacity Revenue that FM has improperly refused to cover in contravention of the Policy.

71. Moreover, FM has insisted on application of two deductibles to the Loss, which is contrary to the Policy language and the facts underpinning CVEC's losses, which dictate that CVEC's losses arise from a *single* **occurrence**.

72. As a direct and proximate result of FM's breach of contract, which is continuing as of the date of this Complaint, CVEC suffered damages in an amount to be determined at trial, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law.

**SECOND CAUSE OF ACTION**
**(Declaratory Judgment)**

73. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

74. Pursuant to the Policy, FM is obligated to pay, up to the limit of liability, for a claim that is covered by the Policy's insuring agreement and is not otherwise excluded from coverage.

75. As detailed above, CVEC's claim falls within the Policy's insuring agreement and coverage is not otherwise excluded.

76. FM disputes its legal obligation to pay the full amount of CVEC's claim.

77. Pursuant to 28 U.S.C. § 2201, CVEC is entitled to a declaration by this Court of FM's obligations under its Policy.

78. An actionable and justiciable controversy exists between CVEC and FM concerning the proper construction of the Policy and the rights and obligations of the parties thereto, with respect to the claim at issue.

79. Pursuant to 28 U.S.C. § 2201, this Court should enter a declaratory judgment in favor of CVEC and against FM, declaring that there is coverage available for CVEC's claim under the Policy, and, pursuant to 28 U.S.C. § 2202, any other relief this Court deems proper. Such a declaration would resolve the current controversy between CVEC and FM.

**THIRD CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

80. Plaintiff repeats and realleges the allegations set forth in the foregoing paragraphs, specifically paragraphs 1, 10–12, and 64–66, as if fully set forth herein.

81. Under New York law, the Policy contains an implied covenant of good faith and fair dealing.

82. CVEC has presented a type of claim well known to FM, which, on information and belief, underwrites policies to numerous policyholders in the power generation industry, including by utilizing the policy form used for the Policy, the Advantage - Power Gen - US NA - 2021 form that the Policy states is copyrighted by FM Global.

83. New York courts have directly addressed the availability of coverage for lost capacity revenue caused during the Period of Liability but not realized until after a power generation policyholder has resumed full operations, including in *National Union Fire Insurance Co. of Pittsburgh, Pa. v. TransCanada Energy USA, Inc.*, in which FM was a party.

84. Both the New York Supreme Court, New York County, and the New York Supreme Court, Appellate Division, First Department ruled in the *TransCanada* case that the insurers, including FM, could not deny coverage for lost capacity revenue based on the argument that lost revenue would not be realized within the Period of Liability. *See* 52 Misc. 3d at 468–69; 153 A.D.3d at 1154.

85. Despite these clear rulings under applicable New York law, FM has denied coverage to CVEC for lost Capacity Revenue attributable to damage occurring to property in New York within the Period of Liability but not scheduled to be realized until months in the future, *i.e.*, the exact argument it made and which was rejected by New York courts.

86. This course of conduct is patently unreasonable, contrary to FM's duty of good faith and fair dealing, has delayed resolution of CVEC's claim, and has further damaged CVEC by, among other things, forcing it to incur costs to commence this litigation to recover the full amount of coverage owed for its Loss under the Policy.

87. Moreover, FM's position on the calculation of the deductible in this case is inconsistent with the Policy language, and no reasonable insurer would adopt this position.

88. Through these actions, FM has breached the Policy's implied covenant of good faith and fair dealing.

89. CVEC has been damaged by FM's breaches of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

90. CVEC is entitled to consequential damages flowing from FM's violations of the implied covenant of good faith and fair dealing, including, without limitation, the attorneys' fees and costs incurred by CVEC in enforcing its rights and as a consequence of FM's bad faith denial of coverage for lost Capacity Revenue beyond the amount FM has agreed to pay, and its unreasonable position regarding the application and calculation of the deductible.

91. Consequential damages, including payment of attorneys' fees and costs, were reasonably contemplated by CVEC and FM at the time they entered into the Policy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a. On the First Cause of Action, Plaintiff requests that the Court enter judgment against Defendant, awarding Plaintiff damages in an amount to be determined at trial, but not less than $75,000, plus consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

b. On the Second Cause of Action, Plaintiff requests that the Court enter a declaratory judgment in favor of Plaintiff against Defendant, declaring that Defendant is required to pay Plaintiff up to the applicable limits of the Policy for the claim;

c. On the Third Cause of Action, Plaintiff requests that the Court enter a judgment against Defendant, awarding Plaintiff damages in an amount to be determined at trial, plus

consequential damages, attorneys' fees, and pre- and post-judgment interest to the extent permitted by law;

d. Additionally, Plaintiff requests such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: New York, New York
December 4, 2025

COHEN ZIFFER FRENCHMAN & MCKENNA LLP

*/s/ Alexander M. Sugzda*
Robin L. Cohen
Alexander M. Sugzda
1325 Avenue of the Americas
New York, New York 10019
Tel: (212) 584-1890
Fax: (212) 584-1891
rcohen@cohenziffer.com
asugzda@cohenziffer.com

*Attorneys for Plaintiff Cricket Valley Energy Center, LLC*